## In re SCHENCK.

### (District Court, D. Washington. July 1, 1902.)

### No. 2,217.

1. DISCHARGE OF BANKRUPT—FRAUDULENT CONVEYANCES.

Where, on an application by a bankrupt for a discharge, it appears that he considered a large portion of his legal liabilities to be unjust, that in view of bankruptcy he contemplated transferring considerable property directly to his daughter, but was deterred from doing so by being warned that such proceeding would probably get him into trouble, and that he then, by a series of questionable trades, so manipulated his property that his children were benefited to the extent of several thousand dollars, at the expense of his estate, his discharge should be denied.

2. SAME—GIFTS—RIGHTS OF CREDITORS—LIMITATION AS TO TIME.

The right of the creditors of a bankrupt to pursue and reclaim property transferred fraudulently by an insolvent debtor as a voluntary gift is not limited to such transfers made within four months of the institution of the bankruptcy proceedings.

Roberts & Leehey, for bankrupt.
Gray & Tait, for creditors.

HANFORD, District Judge. After studying the testimony in this case with patience, I am unable to escape from the conclusion that the bankrupt has deliberately transferred his property with an intention on his part to either retain it for himself or give his family the benefit of it, in fraud of the rights of his creditors. From the examination of the bankrupt, it appears that his affairs are in a state of confusion, but upon being plied with questions he disclosed facts which can be put together, and which, when connected, make as plain a case of deliberate, intentional fraud as could well be made without a confession. To begin with, Mr. Schenck believes that his legal liabilities upon contracts guarantying the value of mining stock which he and another person sold are not just debts. Such obligations constitute a considerable part of his liabilities, and that thought had a tendency to relieve his conscience, and furnished a motive, in addition to the natural desire which any person who has been possessed of a fortune has, to wish to save something from the wreck for the benefit of his family. In the next place, besides having a motive, the testimony of his late associate, Mr. Bacon, shows that he had a disposition to transfer property, so as to give his family the benefit of it, and deprive his creditors of their rights against it. I refer to that part of Mr. Bacon's deposition reciting a conversation showing that Mr. Schenck contemplated going into bankruptcy, and that, with that idea in mind, he proposed to transfer property directly to his daughter, and was deterred from doing so by being warned that such a proceeding would probably get him into trouble. Among the transactions of Mr. Schenck shown by his own testimony, I find that, within a period of less than one year from the date of filing his petition, he advanced $750 to his youngest son, to enable him to go to Alaska, and procure

¶ 1. See Bankruptcy, vol. 6, Cent. Dig. § 740.

an outfit for engaging in mining operations in that country, which was to be repaid to him if the young man met with success in his venture. Although he expected the amount advanced to be a loss if the venture proved to be a failure, it was nevertheless a debt legally due to him, and it should have been listed in his schedule of assets, but was omitted. In February, 1901, Mr. Schenck held a contract of Snyder & Farnsworth, obligating them to pay him $10,000. His son James K. Schenck was at that time indebted to him to an amount approximating $3,800, and was the owner of four-sixteenths of some mining property called the "Crystal Palace," situated in the state of Oregon. No work had been done on the Crystal Palace mine for more than a year previous to that time; it was caved in, and in such a dilapidated condition that its value was entirely a matter of uncertainty. Mr. Sylvester A. Work was at that time the owner of three-sixteenths of the Crystal Palace. Mr. Schenck traded to Work the Snyder & Farnsworth obligation for his three-sixteenths of the Crystal Palace mine, but, instead of making an actual delivery of it, the contract was left in the custody of Mr. Schenck's attorney. Then, in April, 1901, while the parties named were all at Salt Lake, Mr. Schenck arranged with Work to take James K. Schenck's four-sixteenths of the Crystal Palace mine in exchange for the Snyder & Farnsworth contract, and he also arranged to realize on the contract by discounting it, so that Work received $7,500 in cash, and paid that amount of money to Hattie Schenck in lieu of delivering the contract, which he agreed to give as consideration for the transfer to him of James K.'s four-sixteenths of the Crystal Palace mine.. Upon receiving the money, Hattie Schenck paid to her father $4,300, being the amount which James K. owed to him, including $500, which was loaned about the same time to enable James K. to go to Alaska, and the balance of the money, amounting to over $3,000, she retained as a gift from her brother. Within a few days after the consummation of this transaction, the bankrupt traded the same three-sixteenths of the Crystal Palace mine which he obtained in exchange for the Snyder & Farnsworth contract to a man named Stephenson, in settlement of a debt amounting to about $1,300. The final outcome of all this circumlocution was that the bankrupt parted with property of the nominal value of $10,000, and actually worth at least $7,500; he paid a debt of $1,300, and collected $3,800 due to him from his son James K.; Sylvester A. Work gained a one-sixteenth interest in the Crystal Palace mine; James K. Schenck converted four-sixteenths of the Crystal Palace mine, of uncertain value, so that he discharged his indebtedness to his father, and gained $500 in cash, which he needed to enable him to go to Alaska; Hattie Schenck became the recipient of about $3,200, the greater part of which she placed in a safety deposit vault in Seattle, and it is supposed to be there still. The transaction was certainly crooked, and the creditors of the bankrupt are not precluded from attacking it. The right of a trustee to recover money or property paid or transferred by insolvent debtors in payment of bona fide debts is limited to cases in which forbidden preferences have been given within a period of four months preceding the initiation of bankruptcy proceedings, and the referee appears to have considered

this transaction as being affected by the same rule; but I do not understand that there is any such limitation barring the right of creditors to pursue and reclaim property transferred fraudulently by an insolvent debtor as a voluntary gift.

It is unnecessary to mention all the matters in which the conduct of the bankrupt has been criticised by counsel for his creditors, the matters which I have specified being sufficient grounds for this decision. For the reasons above indicated, the application of the bankrupt to be discharged from his debts will be denied.